Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

SHANG PANG, derivatively on behalf of
PAYPAL HOLDINGS, INC.,

    Plaintiff,

    v.

DANIEL H. SCHULMAN, JOHN D.
RAINEY, AARON A. ANDERSON,
JEFFREY KARBOWSKI, RODNEY C.
ADKINS, WENCES CASARES,
JONATHAN CHRISTODORO, JOHN J.
DONAHOE, DAVID W. DORMAN,
BELINDA J. JOHNSON, GAIL J.
McGOVERN, DEBORAH M.
MESSEMER, DAVID M. MOFFETT,
ANN M. SARNOFF, FRANK D.
YEARY,

    Defendants,

    and

PAYPAL HOLDINGS, INC.,

    Nominal Defendant.

Case No.: 2:21-cv-00525-DSF-E

DEMAND FOR JURY TRIAL

## **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Shang Pang ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant PayPal Holdings, Inc. ("PayPal" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Daniel H. Schulman ("Schulman"), John D. Rainey ("Rainey"), Aaron A. Anderson ("Anderson"), Jeffrey W. Karbowski ("Karbowski"), Rodney C. Adkins ("Adkins"), Wences Casares ("Casares"), Jonathan Christodoro ("Christodoro"), John J. Donahoe ("Donahoe"), David W. Dorman ("Dorman"), Belinda J. Johnson ("Johnson"), Gail J. McGovern ("McGovern"), Deborah M. Messemer ("Messemer"), David M. Moffett ("Moffett"), Ann M. Sarnoff ("Sarnoff"), Frank D. Yeary ("Yeary") (collectively, the "Individual Defendants," and together with PayPal, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of PayPal, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Schulman and Rainey for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PayPal, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing

committed by PayPal's directors and officers from February 9, 2017 through July 28, 2021, both dates inclusive (the "Relevant Period").

2. PayPal is a Delaware Corporation based in San Jose, California that operates as a technology platform and digital payments company. The Company offers a variety of payment solutions, including consumer credit services through the Company's PayPal Credit offering, as well as debit card services.

3. PayPal Credit has previously been subject to regulatory scrutiny. In 2015, the Company entered into a Stipulated Final Judgment and Order ("Consent Order") with the Consumer Financial Protection Bureau ("CFPB") in which it settled regulatory claims arising from the Company's PayPal Credit practices between 2011 and 2015. The Consent Order obligated PayPal to pay $15 million in redress to consumers and a $10 million civil monetary penalty. The Consent Order further required PayPal to make various changes to PayPal Credit disclosures and related business practices.

4. Following the Company's entry into the Consent Order, and throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning PayPal's business, operations, and prospects.

5. Specifically, during the Relevant Period, the Individual Defendants caused the Company to repeatedly tout its compliance with the Consent Order in filings with the SEC. In addition, the Individual Defendants caused the Company to acknowledge the Federal Reserve Board's rule capping debit card interchange fees and other related laws and regulations.

6. However, during the Relevant Period, the Individual Defendants failed to disclose compliance issues with PayPal Credit that led to an investigation by the CFPB (the "PayPal Credit Misconduct") and compliance issues with Regulation II of the Board of Governors of the Federal Reserve System governing debit card interchange fees that led to an investigation by the SEC (the "Debit Interchange Misconduct").

7.     The Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period, during which time three of the Individual Defendants benefitted from lucrative insider sales at artificially inflated prices for proceeds of approximately $6.25 million.

8.     The truth emerged on July 29, 2021, when the Company filed its quarterly report on Form 10-Q with the SEC (the "2021Q2 10-Q"), in which the Company disclosed that it was subject to investigations by federal regulatory authorities. Specifically, the Company disclosed that it had received a civil investigative demand ("CID") "from the CFPB related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services." In addition, the Company disclosed that it had "responded to subpoenas and requests for information received from the [SEC] relating to whether the interchange rates paid to the bank that issues debit cards bearing our licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System, and to the reporting of marketing fees earned from the Company's branded card program."

9.     On this news, the Company's stock price fell by $18.81 per share from its closing price of $301.98 on July 28, 2021, to close at $283.17 on July 29, 2021, a decline of approximately 6.23%.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*: (1) the PayPal Credit Misconduct; (2) the Debit Interchange Misconduct; (3) the Company's revenues from its PayPal Credit and debit card services were artificially inflated due to the PayPal Credit Misconduct and the Debit Interchange Misconduct and were therefore unsustainable; (4) as a result of the foregoing, the Company

was subject to an increased risk of regulatory investigations and enforcement actions; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.   The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while three of the Individual Defendants sold Company shares at inflated prices.

12.   In further breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the PayPal Credit Misconduct and the Debit Interchange Misconduct. As a result, the CFPB and the SEC undertook investigations into the PayPal Credit Misconduct and the Debit Interchange Misconduct.

13.   Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.   In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.   The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.   In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial

likelihood of the directors' liability in this derivative action and of the CEO's and CFO's liability in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have regularly conducted business in this District, the Defendants have received substantial compensation in this District, and the Defendants' actions have had an effect in this District.

22.     Venue is also proper in this District because PayPal is headquartered in this District.

Verified Shareholder Derivative Complaint

# PARTIES

## Plaintiff

23.    Plaintiff is a current shareholder of PayPal. Plaintiff has continuously held PayPal common stock at all relevant times.

24.    Plaintiff is not a citizen of the United States.

## Nominal Defendant PayPal

25.    PayPal is a Delaware corporation with its principal executive offices at 2211 North First Street, San Jose, California 95131. PayPal's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "PYPL."

## Defendant Schulman

26.    Defendant Schulman has served as President, CEO, and director of PayPal since July 2015. In addition, he served as the President and CEO-Designee of PayPal from September 2014 until July 2015. According to the Company's Schedule 14A filed with the SEC on April 13, 2021 (the "2021 Proxy Statement"), as of March 30, 2021, Defendant Schulman beneficially owned 364,755 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Schulman owned approximately $86,279,147.70 worth of PayPal stock.

27.    For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Schulman received $23,362,072 in compensation from the Company. This included $1,038,462 in salary, $20,957,193 in stock awards, $1,000,000 in non-equity incentive plan compensation, and $366,417 in all other compensation. For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), Defendant Schulman received $25,825,473 in compensation from the Company. This included $1,000,000 in salary, $23,854,743 in stock awards, $750,000 in non-equity incentive plan compensation, and $220,730 in all other compensation. For the fiscal year ended December 31, 2018 (the "2018 Fiscal Year"), Defendant Schulman received $37,764,588 in compensation from the

Company. This included $1,000,000 in salary, $35,275,516 in stock awards, $875,000 in non-equity incentive plan compensation, and $614,072 in all other compensation. For the fiscal year ended December 31, 2017 (the "2017 Fiscal Year"), Defendant Schulman received $19,218,634 in compensation from the Company. This included $1,000,000 in salary, $16,976,017 in stock awards, $1,000,000 in non-equity incentive plan compensation, and $242,617 in all other compensation.

28.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Schulman made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 2/16/2021 | 10,000 | $303.75 | $3,037,500 |

His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

29.     According to the 2021 Proxy Statement, Defendant Schulman previously served as Group President, Enterprise Group of American Express Company, from August 2010 to August 2014. He also served as President, Prepaid Group of Sprint Nextel Corporation, from November 2009 until August 2010, when Sprint Nextel acquired Virgin Mobile, USA. In addition, he has served as a board member on various public companies, including Verizon Communications Inc., Flex Ltd., and NortonLifeLock.

30.     Upon information and belief, Defendant Schulman is a citizen of California.

**Defendant Rainey**

31.     Defendant Rainey has served as the Company's CFO since August 2015. In addition, he has served as Executive Vice President, Global Customer Operations since January 2018. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Rainey beneficially owned 107,845 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30,

2021 was $236.54, Defendant Rainey owned approximately $25,509,656.30 worth of PayPal stock.

32.     For the 2020 Fiscal Year, Defendant Rainey received $10,015,110 in compensation from the Company. This included $778,846 in salary, $8,896,739 in stock awards, $328,125 in non-equity incentive plan compensation, and $11,400 in all other compensation. For the 2019 Fiscal Year, Defendant Rainey received $11,182,014 in compensation from the Company. This included $750,000 in salary, $10,139,564 in stock awards, $281,250 in non-equity incentive plan compensation, and $11,200 in all other compensation. For the 2018 Fiscal Year, Defendant Rainey received $9,524,190 in compensation from the Company. This included $721,154 in salary, $8,463,911 in stock awards, $328,125 in non-equity incentive plan compensation, and $11,000 in all other compensation. For the 2017 Fiscal Year, Defendant Rainey received $8,631,687 in compensation from the Company. This included $650,000 in salary, $5,645,887 in stock awards, $325,000 in non-equity incentive plan compensation, and $2,010,800 in all other compensation.

33.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rainey made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 2/17/2021 | 5,377 | $298 | $1,602,346 |

His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

34.     According to the 2021 Proxy Statement, Defendant Rainey previously served as Executive Vice President and Chief Financial Officer at United Airlines from August 2015 to September 2016 and as Senior Vice President of Financial Planning and Analysis at United Continental Holdings, Inc. from October 2010 to April 2012. In addition, he has

served as a member of the Board of Directors of Nasdaq, Inc. since 2017.

35.    Upon information and belief, Defendant Rainey is a citizen of California.

**Defendant Anderson**

36.    Defendant Anderson joined the Company as a Controller in June 2014 and currently serves as the Company's Treasurer. He previously served as the Company's Chief Accounting Officer from July 2015 until August 2020. Prior to joining the Company, Defendant Anderson served as Assistant Controller at MasterCard and Director, IFRS Policy & Implementation at IBM.

37.    Upon information and belief, Defendant Anderson is a citizen of California.

**Defendant Karbowski**

38.    Defendant Karbowski joined the Company in May 2013 and has served since August 2020 as Vice President, Chief Accounting Officer. In his time with the Company, and in addition to his current role, Defendant Karbowski has served as Controller, New Ventures; Director, Assistant Controller; Senior Director, Controller; and Vice President, Global Controller. He previously served as Director, Accounting at Microsoft Corp.

39.    Upon information and belief, Defendant Karbowski is a citizen of California.

**Defendant Adkins**

40.    Defendant Adkins has served as a Company director and as a member of the Audit, Risk, and Compliance Committee ("ARC Committee") since September 26, 2017. In addition, he has served as member of the Governance Committee since at least September 2018. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Adkins beneficially owned 17,843 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Adkins owned approximately $4,220,583.22 worth of PayPal stock.

41.    For the 2020 Fiscal Year, Defendant Adkins received $385,096 in compensation from the Company. This included $110,000 in fees earned or paid in cash

and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant Adkins received $385,102 in compensation from the Company. This included $110,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant Adkins received $377,681 in compensation from the Company. This included $102,658 in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant Adkins received $191,667 in compensation from the Company. This included $26,575 in fees earned or paid in cash and $165,092 in stock awards.

42.     According to the 2021 Proxy Statement, Defendant Adkins has served since January 2015 as President of 3RAM Group LLC, a privately held company specializing in capital investments, business consulting services and property management. In addition, he spent over 30 years at International Business Machines Corporation (IBM) in various development and management roles, including Senior Vice President of Corporate Strategy. Furthermore, he has served as a director on the boards of various public and former public companies, including Avnet, Inc., United Parcel Service, Inc., W.W. Grainger, Inc., and PPL Corporation.

43.     Upon information and belief, Defendant Adkins is a citizen of Florida.

**Defendant Casares**

44.     Defendant Casares served as a Company director from January 2016 until the Company's annual meeting on May 21, 2020. During that time, he also served as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 27, 2021, Defendant Casares beneficially owned 22,213 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2020 was $93.48, Defendant Casares owned approximately $2,076,471.24 worth of PayPal stock.

45.     For the 2020 Fiscal Year, Defendant Casares received $98,000 in compensation from the Company, comprised solely of fees earned or paid in cash. For the 2019 Fiscal Year, Defendant Casares received $373,102 in compensation from the

Company. This included $98,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant Casares received $373,023 in compensation from the Company. This included $98,000 in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant received $348,043 in compensation from the Company. This included $98,000 in fees earned or paid in cash and $250,043 in stock awards.

46.     According to the Company's Schedule 14A filed with the SEC on April 10, 2019 (the "2019 Proxy Statement"), Defendant Casares is a founder of Xapo Inc., a bitcoin wallet and vault startup, for which he served as CEO from 2014 until at least 2019. In addition, he is a founder and former Chief Executive Officer of Lemon Inc., a digital wallet platform. He formerly served as Co-CEO of Bling Nation Ltd., a mobile payments platform, and has served on the Board of Directors of Endeavor Global.

47.     Upon information and belief, Defendant Casares is a citizen of California.

**Defendant Christodoro**

48.     Defendant Christodoro has served as a Company director since July 2015. He served as a member of the Compensation Committee throughout the Relevant Period and as a member of the Governance Committee since at least 2020. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Christodoro beneficially owned 24,087 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Christodoro owned approximately $5,697,538.98 worth of PayPal stock.

49.     For the 2020 Fiscal Year, Defendant Christodoro received $382,685 in compensation from the Company. This included $107,589 in fees earned or paid in cash and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant Christodoro received $373,102 in compensation from the Company. This included $98,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant Christodoro received $373,023 in compensation from the Company. This included $98,000

in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant Christodoro received $348,043 in compensation from the Company. This included $98,000 in fees earned or paid in cash and $250,043 in stock awards.

50.     According to the 2021 Proxy Statement, Defendant Christodoro has served as a Partner at Patriot Global Management, L.P., an investment management firm, since March 2019. He served as Managing Director of Icahn Capital LP from July 2012 to February 2017. In addition, he served in various investment and research roles from 2007 to 2012, and began his career as an investment banking analyst at Morgan Stanley. He served in the United States Marine Corps, and has served as a director on the boards of various companies, including Pioneer Merger Corp., Sandridge Energy, Inc., Xerox Corporation, Enzon Pharmaceuticals, Inc., Herbalife Ltd., and Lyft, Inc.

51.     Upon information and belief, Defendant Christodoro is a citizen of New York.

**Defendant Donahoe**

52.     Defendant Donahoe has served as a Company director since July 2015. In addition, he served as Chair of the Board throughout the Relevant Period. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Donahoe beneficially owned 56,630 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Donahoe owned approximately $13,395,260.20 worth of PayPal stock.

53.     For the 2020 Fiscal Year, Defendant Donahoe received $455,046 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $325,046 in stock awards. For the 2019 Fiscal Year, Defendant Donahoe received $455,038 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $325,038 in stock awards. For the 2018 Fiscal Year, Defendant Donahoe received $622,563 in compensation from the Company. This included $180,000 in fees earned or paid in cash, $375,076 in stock awards, and $67,487 in option awards. For the 2017 Fiscal Year, Defendant Donahoe received $530,050 in compensation from the

Company. This included $180,000 in fees earned or paid in cash and $350,050 in stock awards.

54.     According to the 2021 Proxy Statement, Defendant Donahoe has served as President and CEO of Nike, Inc. since January 2020. He formerly served as President and CEO of ServiceNow, Inc. from 2017 to 2019, and as President and CEO of eBay Inc. from 2008 to 2015. From 2000 to 2005, Defendant Donahoe was Worldwide Managing Director of Bain & Company. In addition, he has served as a director on the boards of Nike, Inc., ServiceNow, Inc., and eBay Inc.

55.     Upon information and belief, Defendant Donahoe is a citizen of Oregon.

**Defendant Dorman**

56.     Defendant Dorman has served as a Company director since June 2015. He served as Chair of the Compensation Committee and as a member of the Governance Committee throughout the Relevant Period. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Dorman beneficially owned 43,837 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Dorman owned approximately $10,369,203.98 worth of PayPal stock.

57.     For the 2020 Fiscal Year, Defendant Dorman received $385,096 in compensation from the Company. This included $110,000 in fees earned or paid in cash and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant Dorman received $385,102 in compensation from the Company. This included $110,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant Dorman received $385,023 in compensation from the Company. This included $110,000 in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant Dorman received $360,043 in compensation from the Company. This included $110,000 in fees earned or paid in cash and $250,043 in stock awards.

58.     According to the 2021 Proxy Statement, Defendant Dorman has served as

Founding Partner of Centerview Capital Technology Fund, a private investment firm, since July 2013, and as Board Chair of InfoWorks, a portfolio company of Centerview, since January 2019. In addition, he has served as Lead Independent Director of the Board of Motorola Solutions, Inc.; Non-Executive Board Chair of Motorola, Inc.; Senior Advisor and Managing Director to Warburg Pincus LLC, a global private equity firm; President and director of AT&T Corporation; Board Chair, CEO, and President of AT&T Corp.; and as a Trustee for Georgia Tech Foundation, Inc. Furthermore, he has served on the boards of CVS Health Corporation and Dell Technologies, Inc.

59.   Upon information and belief, Defendant Dorman is a citizen of Georgia.

**Defendant Johnson**

60.   Defendant Johnson has served as a Company director and as a member of the ARC Committee since January 2017. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Johnson beneficially owned 17,199 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Johnson owned approximately $4,068,251.46 worth of PayPal stock.

61.   For the 2020 Fiscal Year, Defendant Johnson received $375,096 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant Johnson received $375,102 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant Johnson received $375,023 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant Johnson received $347,029 in compensation from the Company. This included $96,986 in fees earned or paid in cash and $250,043 in stock awards.

62.   According to the 2021 Proxy Statement, Defendant Johnson served as the CEO of Airbnb, Inc. from February 2018 to March 2020 and as Chief Business Affairs and

Legal Officer of Airbnb, Inc. from July 2015 to February 2018. She previously served in positions at Yahoo! Inc. from 1999 until 2011, and was General Counsel of Broadcast.com from 1996 until 1999.

63.     Upon information and belief, Defendant Johnson is a citizen of California.

**Defendant McGovern**

64.     Defendant McGovern has served as a Company director since June 2015. She served as Chair of the Governance Committee throughout the Relevant Period and as a member of the ARC Committee during a portion of the Relevant Period in 2017. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant McGovern beneficially owned 19,141 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant McGovern owned approximately $4,527,612.14 worth of PayPal stock.

65.     For the 2020 Fiscal Year, Defendant McGovern received $393,096 in compensation from the Company. This included $118,000 in fees earned or paid in cash and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant McGovern received $393,102 in compensation from the Company. This included $118,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant McGovern received $393,023 in compensation from the Company. This included $118,000 in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant McGovern received $370,043 in compensation from the Company. This included $120,000 in fees earned or paid in cash and $250,043 in stock awards.

66.     According to the 2021 Proxy Statement, Defendant McGovern has served as President and CEO of the American Red Cross since June 2008. She served as a faculty member at the Harvard Business School from 2002 to 2008. She also previously served as President of Fidelity Personal Investments from 1998 to 2002 and as Executive Vice President, Consumer Markets Division at AT&T Corporation from 1997 to 1998. In addition, she has served as a director on the board of DTE Energy Company.

67.     Upon information and belief, Defendant McGovern is a citizen of the District of Columbia.

**Defendant Messemer**

68.     Defendant Messemer has served as a Company director and a member of the ARC Committee since January 2019. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Messemer beneficially owned 5,359 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Messemer owned approximately $1,267,617.86 worth of PayPal stock.

69.     For the 2020 Fiscal Year, Defendant Messemer received $375,096 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant Messemer received $191,601 in compensation from the Company. This included $95,890 in fees earned or paid in cash and $95,711 in stock awards.

70.     According to the 2021 Proxy Statement, Defendant Messemer served for over 35 years at KPMG, first in the audit practice and then as Audit Engagement Partner or Global Senior Relationship Partner for clients in a variety of industries, including financial services and technology. She has also served as a director on the boards of Allogene Therapeutics, Inc. and Carbon, Inc.

71.     Upon information and belief, Defendant Messemer is a citizen of California.

**Defendant Moffett**

72.     Defendant Moffett has served as a Company director since June 2015. In addition he was the Company's Lead Independent Director from July 2015 through December 2018. In addition, he served as Chair of the ARC Committee throughout the Relevant Period. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Moffett beneficially owned 71,988 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021

was $236.54, Defendant Moffett owned approximately $17,028,041.52 worth of PayPal stock.

73.    For the 2020 Fiscal Year, Defendant Moffett received $395,096 in compensation from the Company. This included $120,000 in fees earned or paid in cash and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant Moffett received $395,102 in compensation from the Company. This included $120,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant Moffett received $470,023 in compensation from the Company. This included $195,000 in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant Moffett received $430,043 in compensation from the Company. This included $180,000 in fees earned or paid in cash and $250,043 in stock awards.

74.    According to the 2021 Proxy Statement, Defendant Moffett formerly served as CEO and director of Federal Home Loan Mortgage Corp. He also previously served as CFO of Star Banc Corporation. In addition, Defendant Moffett has served as a Trustee for Columbia Atlantic Mutual Funds and University of Oklahoma Foundation, and as a director on the boards of CSX Corporation, Genworth Financial, Inc., and eBay Inc.

75.    Upon information and belief, Defendant Moffett is a citizen of Florida.

**Defendant Sarnoff**

76.    Defendant Sarnoff has served as a Company director and a member of the ARC Committee since June 2017. According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Sarnoff beneficially owned 11,551 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Sarnoff owned approximately $2,732,273.54 worth of PayPal stock.

77.    For the 2020 Fiscal Year, Defendant Sarnoff received $375,096 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant Sarnoff received

$375,102 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant Sarnoff received $375,023 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant Sarnoff received $278,930 in compensation from the Company. This included $51,506 in fees earned or paid in cash and $227,424 in stock awards.

78.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sarnoff made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 2/16/2021 | 5,290 | $303.49 | $1,605,462.10 |

79.     Her insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme

80.     According to the 2021 Proxy Statement, Defendant Sarnoff has served as Board Chair and CEO of WarnerMedia Studios & Networks Group since August 2020, and she also serves as Board Chair of BritBox, a joint venture subscription streaming service. In addition, she served as Board Chair and CEO of Warner Bros. Entertainment from August 2019 to August 2020. She was President of BBC Studios Americas from August 2015 to August 2019 and Chief Operating Officer of BBC Worldwide North American from 2010 to July 2015. She has served as a director on the boards of Georgetown University and HSN, Inc., and is vice chair of the McDonough School of Business at Georgetown.

81.     Upon information and belief, Defendant Sarnoff is a citizen of New York.

**Defendant Yeary**

82.     Defendant Yeary has served as a Company director since July 2015. In addition, he served as a member of the ARC Committee throughout the Relevant Period.

According to the 2021 Proxy Statement, as of March 30, 2021, Defendant Yeary beneficially owned 25,161 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2021 was $236.54, Defendant Yeary owned approximately $5,951,582.94 worth of PayPal stock.

83.     For the 2020 Fiscal Year, Defendant Yeary received $375,096 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,096 in stock awards. For the 2019 Fiscal Year, Defendant Yeary received $375,102 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,102 in stock awards. For the 2018 Fiscal Year, Defendant Yeary received $375,023 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $275,023 in stock awards. For the 2017 Fiscal Year, Defendant Yeary received $350,043 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $250,043 in stock awards.

84.     According to the 2021 Proxy Statement, Defendant Yeary has served as Managing Member at Darwin Capital Advisors, LLC, a private investment firm, since October 2018, and has been a Member since 2012. He was Executive Chair of CamberView Partners, LLC, a corporate advisory firm, from 2012 until 2018. In addition, he was Vice Chancellor of the University of California, Berkeley, from 2008 to 2012. Defendant Yeary spent 25 years in the finance industry, most recently as Managing Director, Global Head of Mergers and Acquisitions and as a member of the Management Committee at Citigroup Investment Banking.

85.     Upon information and belief, Defendant Yeary is a citizen of California.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

86.     By reason of their positions as officers, directors, and/or fiduciaries of PayPal and because of their ability to control the business and corporate affairs of PayPal, the Individual Defendants owed PayPal and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to

control and manage PayPal in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of PayPal and its shareholders so as to benefit all shareholders equally.

87.     Each director and officer of the Company owes to PayPal and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

88.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of PayPal, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

89.     To discharge their duties, the officers and directors of PayPal were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

90.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of PayPal, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised PayPal's Board at all relevant times.

91.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded

on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

92.    To discharge their duties, the officers and directors of PayPal were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of PayPal were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to PayPal's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how PayPal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of PayPal and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent

investigation to be made of, said reports and records;

       (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that PayPal's operations would comply with all applicable laws and PayPal's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

93.    Each of the Individual Defendants further owed to PayPal and the shareholders the duty of loyalty requiring that each favor PayPal's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

94.    At all times relevant hereto, the Individual Defendants were the agents of each other and of PayPal and were at all times acting within the course and scope of such agency.

95.    Because of their advisory, executive, managerial, and directorial positions with PayPal, each of the Individual Defendants had access to adverse, non-public information about the Company.

96.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts

complained of herein, as well as the contents of the various public statements issued by PayPal.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

97.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

98.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

99.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of PayPal was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

100.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist

the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

101.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of PayPal, and was at all times acting within the course and scope of such agency.

## PAYPAL'S CORPORATE GOVERNANCE

### *Code of Conduct*

102.   PayPal's Code of Conduct purports to "provide[] a consistent ethical compass to guide our judgment and behavior as PayPal employees." The Code of Conduct states that it "applies to every employee at every level of PayPal Holdings, Inc. and its subsidiaries (collectively, the 'Company'), as well as our directors."

103.   In a section titled, "Conflicts," the Code of Conduct states the following:

We are committed to ensuring that every action we take is in full compliance with the law. If there is a conflict between the Code or a Company policy and the law, making it impossible for you to comply with both, the law prevails. In many cases, the Code's standards will be stricter than legal requirements. In these instances, follow the Code.

104.   In a section titled, "Maintaining Business Records," the Code of Conduct states the following:

You are responsible for maintaining official business records in accordance with the Company's records management-related policies and retention schedules. This requires:
• Correct recording and reporting of financial data without misleading, misrepresenting, misinforming or omitting important information;
• Preserving all documents relevant to accounting, litigation, government investigations or internal/external audit until otherwise notified by Legal; and
• Disposing of business records that no longer need to be retained for business

reasons.

105.   In a section titled, "Accurate Accounts and Records," the Code of Conduct states the following:

> We have an obligation to our business, shareholders, employees, customers and regulators to ensure that our accounts and business records are complete, accurate, timely and understandable. Business records are critical for internal decision making as well as for reporting to regulators and investors. Maintaining accurate records is consistent with our values and helps establish and maintain our reputation for integrity.
>
> You must never falsify, forge, backdate or improperly alter any Company document. Ever. You must ensure that all transactions are lawful, recorded in the proper account and executed in accordance with all Company internal controls. All disclosures you make to regulatory authorities and investors must be complete, accurate, timely and understandable.

106.   In a section titled, "Conflicts of Interest," the Code of Conduct states the following:

> Always act in the best interests of PayPal and the PayPal global community, and don't let your personal interests conflict – or appear to conflict – with the Company's interests. A conflict of interest arises when a personal interest conflicts or appears to conflict with the duties that you perform for the Company. Conflicts of interest can arise in many situations, including through personal relationships with family and friends, financial interests in companies that do business with PayPal, and business opportunities that you may learn about through your position at PayPal.
>
> Even an apparent conflict of interest can hurt PayPal's business and reputation. An apparent conflict of interest is a situation where an observer might conclude that an employee's judgment was influenced by something other than the Company's best interest. For example, if you have a personal or financial relationship with a PayPal vendor, it might appear to others that you are giving the vendor preferential treatment – even if you don't.
>
> You are required to disclose to a BEO [("Business Ethics Officer")], as soon as possible, any situation in which you are involved or plan to become involved which could result in an actual, potential or apparent conflict of

interest. The best rule for any conflict situation is to disclose and abstain: disclose the conflict to a BEO and abstain from making any decisions that might be affected by the conflict. A BEO can provide guidance to resolve the issue.

107.   In a section titled, "Insider Trading," the Code of Conduct states the following, in relevant part:

> Federal, state, and foreign laws prohibit trading in securities by persons who have Material Non-Public Information. This type of insider information may not be used to gain financial advantage when buying or selling stock and may not be passed along to others who may trade on it. In addition, employees may not trade in PayPal stock during Company specified black-out periods. Each of us is subject to different black-out periods depending on our assigned employee classification.

### *Audit, Risk, and Compliance Committee Charter*

108.   The ARC Committee Charter ("ARC Charter") states that the ARC Committee shall provide assistance and guidance to the Board "in fulfilling its oversight responsibilities to the Company's stockholders with respect to" the following:

> (i) the Company's corporate accounting and financial reporting practices and the audit of the Company's financial statements, (ii) the independent auditors' qualifications and independence, (iii) the performance of the Company's internal audit function and independent auditors, (iv) the quality and integrity of the Company's financial statements and reports, (v) reviewing and approving all audit engagement fees and terms, as well as all non-audit engagements with the independent auditors, (vi) producing the report that the rules of the Securities and Exchange Commission ("SEC") require to be included in the Company's annual proxy statement, (vii) overseeing the Company's overall risk framework and risk appetite framework and (viii) the Company's compliance with legal and regulatory requirements.

109.   In a section titled, "Financial reporting principles and policies and internal controls and procedures," the ARC Charter tasks the ARC Committee with the following duties and responsibilities:

> (a) Consider and discuss with the independent auditors any reports or

communications (and management's and/or the internal audit department's responses thereto) submitted to the Committee by the independent auditors required by applicable accounting standards;

(b) Confer with the independent auditors, the internal audit team and senior management in separate executive sessions to discuss any matters that the Committee, the independent auditors, the internal audit team or senior management believe should be discussed privately with the Committee;

(c) Review with the Company's Chief Business Affairs and Legal Officer, Chief Risk Officer and/or Chief Compliance Officer, as applicable, any significant legal, compliance or regulatory matters that could have a material impact on the Company's financial statements, business or compliance policies, including material notices to or inquiries received from governmental agencies;

(d) Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters;

(e) Discuss the types of financial information and earnings guidance (including the use of "pro forma," "adjusted" or other non-GAAP financial measures), and the types of presentations made, to analysts and rating agencies;

(f) Discuss generally disclosure of key performance metrics, including how the measures are calculated or determined, whether they are consistently prepared and presented and how the Company's disclosure controls and procedures relate to disclosure of such measures;

(g) Establish hiring policies for employees and former employees of the independent auditors. These policies shall provide that no former employee of the independent auditors may become the Chief Executive Officer, Chief Financial Officer, Vice President, Risk and Internal Audit, Chief Accounting Officer or Controller (or serve in a similar capacity) if such person participated in any capacity in the Company's audit within the one-year period preceding the date of the initiation of the audit;

(h) Discuss with the independent auditors and management the internal audit department responsibilities, budget and staffing and any recommendations regarding the internal audit department;

(i) Review the significant findings to management prepared by the internal audit department and management's responses;

(j) Discuss earnings press releases;

(k) Discuss the Company's treasury activities (including with respect to its capital structure, investments and cash management) and related risks; and

27

Verified Shareholder Derivative Complaint

1   (l) Discuss the Company's tax strategies and related risks.

2   110.   In a section titled "Reporting and recommendations," the ARC Charter tasks

3   the ARC Committee with the following duties and responsibilities:

4   (a) Prepare the report of the Committee and any other disclosures required
5   by the rules of the SEC to be included in the Company's annual proxy
6   statement and recommend to the Board that the audited financial statements
    be included in the Company's Annual Report on Form 10-K;

7   (b) Report to the Board on a regular basis and from time to time or
8   whenever it shall be called upon to do so, and make recommendations to the
    Board as described in this charter and with respect to other matters as the
9   Committee may deem necessary or appropriate;

10  (c) Consider any reports submitted to the Committee by the independent
    auditors required by any applicable law or regulation;

11  (d) Meet with management, the independent auditors and, if appropriate,
    the Chief Accounting Officer to discuss: the scope of the annual audit, the
12  audited financial statements and quarterly financial statements including the
13  Company's disclosures under "Management's Discussion and Analysis of
    Financial Condition and Results of Operations"; any significant matters
14  arising from any audit, including any audit problems or difficulties, whether
15  raised by management, the internal audit department or the independent
    auditors, relating to the Company's financial statements; any audit problems
16  or difficulties, including any restrictions on the scope of the independent
17  auditors' activities or access to requested information, and any significant
    disagreements with management; any critical audit matters; any "management
18  letter" or "internal control" letter issued, or proposed to be issued; any major
19  issues regarding accounting principles and financial statement presentations,
    including any significant changes to the Company's auditing and accounting
20  principles, policies, controls, procedures and practices, and any major issues
21  as to the adequacy of the Company's internal controls and any special audit
    steps adopted in light of material control deficiencies; analyses prepared by
22  management and/or the independent auditors setting forth significant financial
23  reporting issues and judgments made in connection with the preparation of the
    financial statements, including analyses of the effects of alternative GAAP
24  methods on the financial statements; and the effect of regulatory and
25  accounting initiatives, as well as off-balance sheet structures, on the financial
    statements of the Company; and
26
    (e) Inquire of the Company's Chief Executive Officer and Chief Financial
27  Officer as to the existence of any significant deficiencies in the design or
28  operation of the Company's internal controls that could adversely affect the

Company's ability to record, process, summarize and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

111.   In a section titled "Compliance program," the ARC Charter tasks the ARC Committee with the following duties and responsibilities:

(a) Periodically review and approve the Company's enterprise-wide Compliance Program and Global Financial Crimes framework policies, as appropriate;

(b) Receive and discuss reports on the Company's Annual Risk and Compliance Plans;

(c) Review and discuss periodic reports from the Chief Risk Officer and Chief Compliance Officer, and other members of management as appropriate, regarding ongoing enhancements to, and overall effectiveness of, the Company's enterprise-wide Compliance Program and the Company's Global Financial Crimes Program;

(d) Review and discuss compliance risks, the level of compliance risk, management actions on significant compliance matters (e.g., actions taken to remediate significant compliance issues, progress of major compliance initiatives, and remediation progress of open regulatory actions) and reports concerning the Company's compliance with applicable law and regulation;

(e) Review and discuss significant examination reports from regulatory authorities, or summaries of the same;

(f) Review and discuss reports on any key organizational changes within the Company to ensure the Company's Compliance function has the appropriate size, skills, stature and independence;

(g) Review and discuss reports from management regarding significant reported ethics violations under the Company's Code of Business Conduct and Ethics and other corporate governance policies;

(h) Review and discuss reports on selected compliance topics as management or the Committee deems appropriate;

(i) Periodically review and approve the Company's Code of Business Conduct and Ethics; and

(j) Review and discuss all requests for waivers of the Code of Business Conduct and Ethics involving directors and executive officers and make recommendations to the Board as to whether it should approve any such request.

112.   In violation of the Code of Conduct, the ARC Charter, and the Company's corporate governance documents, the Individual Defendants conducted little, if any,

oversight of the Company's engagement in the PayPal Credit Misconduct and the Debit Interchange Misconduct, and the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof.  Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

113.   PayPal is a digital payments company that offers consumer credit services through PayPal Credit as well as debit card services.

114.   As the Company acknowledges, the global payments industry in which it operates is "increasingly subject to regulatory scrutiny and oversight."

115.   Despite their knowledge of the Company's compliance and regulatory responsibilities, the Individual Defendants caused or permitted the Company to engage in the PayPal Credit Misconduct and the Debit Interchange Misconduct. As a result, the CFPB and the SEC undertook investigations into the PayPal Credit Misconduct and the Debit Interchange Misconduct.

116.   Moreover, the Individual Defendants caused the Company to tout its compliance with applicable laws and regulations, despite this not being the case and as evidenced by the Company issuing false and misleading statements.

### PayPal Credit Misconduct

117.   PayPal Credit has previously been subject to regulatory scrutiny. In 2015, the Company entered into a Stipulated Final Judgment and Order ("Consent Order") with the

CFPB in which it settled regulatory claims arising from PayPal Credit practices between 2011 and 2015. The Consent Order obligated PayPal to pay $15 million in redress to consumers and a $10 million civil monetary penalty. The Consent Order further required PayPal to make various changes to PayPal Credit disclosures and related business practices.

118.   Despite the Company's history of non-compliance with respect to PayPal Credit, as evidenced by the Consent Order, the Individual Defendants caused or permitted the Company to engage in the PayPal Credit Misconduct. Furthermore, the Individual Defendants failed to engage in oversight or implement internal controls to ensure that the Company's practices regarding its PayPal Credit service were in compliance with applicable laws and regulations. As a result, the Company engaged in the PayPal Credit Misconduct.

119.   The Company's PayPal Credit practices have drawn the attention of consumer advocacy groups, including the Student Borrower Protection Center ("SBPC"), a nonprofit organization that advocates for student loan borrowers by engaging in advocacy, policymaking, and litigation strategy.

120.   In July 2020, SBPC released a report titled, "Shadow Student Debt" (the "SBPC Report").[1] The SBPC Report highlighted financial distress suffered by vulnerable borrowers as a result of student loans made by private lenders, noting that student loan lenders "have been the subject of warnings by financial regulators."

121.   The SBPC Report stated that "lawmakers, law enforcement officials, and regulators at every level can take immediate action to protect students and families from abuses by the firms driving borrowers to take on shadow student debt." In particular, the SBPC Report encouraged government officials to, *inter alia*: "Enforce existing consumer protection laws"; "Enforce existing state licensing and registration requirements to bring firms out of the shadows"; "Implement, enforce, and expand the Student Loan Sunshine

---

[1]   https://protectborrowers.org/wp-content/uploads/2020/07/Shadow-Student-Debt.pdf (last accessed 10/20/2021)

Act"; and "Create a federal registry of all nonbank financial services firms, including the firms driving the growth of shadow student debt."

122.    The SBPC Report concluded with the following statement, in relevant part: "Lawmakers, regulators, and law enforcement officials at every level of government should immediately take the steps outlined above *to scrutinize the players and practices identified in this report* and to modernize the laws necessary to protect students." (Emphasis added.)

123.    Notably, PayPal is explicitly identified in the SBPC Report as a Company engaging in the scrutinized "shadow student debt" practices. Specifically, the Report states that "the financial technology company PayPal, through a subsidiary branded as PayPal Credit, offers credit to students attending higher education programs that do not allow them to borrow federal student loans." The SBPC Report noted that PayPal Credit has been advertised as a payment method at institutions including, among others: Boston University's Online Paralegal Studies Certificate Program; KCI EMT Training, a Utah-based training program for emergency medical technicians and paramedics; and the Energetic Health Institute, a school registered in Oregon that teaches a "complete holistic healing arts system."

124.    The SBPC and three allied groups sent a letter outlining the findings of the SBPC Report to Defendant Schulman, in his official capacity as PayPal's President and CEO (the "SBPC Letter").[2] The SBPC Letter, dated August 20, 2020, linked the Company's PayPal Credit practices to "a wide range of for-profit educational institutions, *many of them bearing the hallmarks of schools that have cheated or failed borrowers in the past*." (Emphasis added.) The SBPC Letter listed specific examples of "unaccredited, unproven, and lightly or wholly unsupervised" institutions for which PayPal Credit was offered as a preferred option for financing, including institutions offering courses in "essential oils, swordsmanship, hypnosis, or veganism." (Footnotes omitted.)

---

[2]    https://protectborrowers.org/wp-content/uploads/2020/08/PayPal-Credit-letter-Company.pdf (last accessed 10/20/2021).

125.   The SBPC Letter stated that PayPal Credit and its partner Synchrony Bank "perpetuate many of the ***predatory financial practices*** that plague borrowers attending for-profit schools." (Emphasis added.) In particular, the SBPC Letter noted that a "deferred interest" arrangement in PayPal Credit's terms and conditions was similar to schemes that "***have drawn concern from regulators***, including through actions that the CFPB has taken toward [PayPal's] partner, Synchrony Bank." (Emphasis added.) Indeed, the CFPB took issue with the Company's deferred interest practices related to PayPal Credit in its 2015 investigation, and the Consent Order specifically enjoined PayPal from misrepresenting the terms and conditions of PayPal Credit related to deferred interest.

126.   In addition to the SBPC Letter, the SBPC sent another letter dated August 20, 2020 to the CFPB, which drew on the SBPC Report and detailed the SBPC's concerns regarding the practices of PayPal Credit and PayPal's partner Synchrony Bank. The letter "call[ed] for an immediate investigation into PayPal, Synchrony Bank, and their business practices related to PayPal Credit." Furthermore, the letter stated: "We urge you to scrutinize PayPal's conduct, and to take immediate action to halt practices that run afoul of the financial laws that your agencies administer and enforce."

127.   The CFPB initiated an investigation into the Company's PayPal Credit Misconduct. Specifically, the CFPB served the Company with a CID "related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services." The CID requires the Company to produce documents, written reports, and answers to written questions.

### Debit Interchange Misconduct

128.   In the Company's annual report filed on Form 10-K with the SEC on February 8, 2017 (the "2016 10-K"), the Company acknowledged that "the Federal Reserve Board issued a final rule capping debit card interchange fees at significantly lower rates than Visa or MasterCard previously charged."

129.   Nevertheless, the Individual Defendants caused or permitted the Company to

engage in the Debit Interchange Misconduct. In addition, the Individual Defendants failed to engage in oversight or implement effective internal controls to ensure the Company's compliance with the rules of the Federal Reserve Board, including Regulation II, which pertains to debit card interchange fees. As a result, the Company engaged in the Debit Interchange Misconduct, prompting the SEC to initiate an investigation into the Company. Specifically, the SEC served the Company with subpoenas and requests for information "relating to whether the interchange rates paid to the bank that issues debit cards bearing our licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System, and to the reporting of marketing fees earned from the Company's branded card program."

**False and Misleading Statements**

***February 8, 2017 Form 10-K***

130.    On February 8, 2017, the Company filed its annual report for the Fiscal Year ended December 31, 2016 (the "2016 Fiscal Year") on the 2016 10-K. The 2016 10-K was signed by Defendants Schulman, Rainey, Anderson, Casares, Donahoe, Dorman, Johnson, McGovern, Moffett, and Yeary, and non-party Pierre M. Omidyar, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Schulman and Rainey attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131.    The 2016 10-K disclosed net revenues of $10.842 billion for the 2016 Fiscal Year, which included $9.49 billion in transaction revenues and $1.352 in revenues from other value added services.

132.    The 2016 10-K stated the following regarding the Company's disclosure controls and procedures:

*Evaluation of disclosure controls and procedures.* Based on the evaluation of

our disclosure controls and procedures (as defined in the Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act), our principal executive officer and our principal financial officer have concluded that as of December 31, 2016, the end of the period covered by this report, ***our disclosure controls and procedures were effective.***

(Emphasis added.)

133. The 2016 10-K also included the following statement touting the Company's implementation of "compliant solutions" for the regulatory environment in which the Company operates:

We operate globally and in a rapidly evolving regulatory environment characterized by a heightened regulatory focus on all aspects of the payments industry. That focus continues to become even more heightened as regulators on a global basis focus on such important issues as . . . ***consumer protection***. Some of the laws and regulations to which we are subject were enacted recently and the laws and regulations applicable to us, including those enacted prior to the advent of digital and mobile payments, are continuing to evolve through legislative and regulatory action and judicial interpretation. Non-compliance with laws and regulations, increased penalties and enforcement actions related to non-compliance, changes in laws and regulations or their interpretation, and the enactment of new laws and regulations applicable to us could have a material adverse impact on our business, results of operations and financial condition. Therefore, ***we monitor these areas closely to ensure compliant solutions for our customers who depend on us***.

(Emphasis added.)

134. The 2016 10-K disclosed that the Company had entered into the 2015 Consent Order with the CFPB. With respect to the Company's efforts at implementing the changes to PayPal Credit disclosures and related business practices required by the Consent Order, the 2016 10-K stated: "***We continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order***, which may result in us incurring additional costs." (Emphasis added.)

135. The 2016 10-K also included a discussion of rules and regulations reducing debit card interchange fees, and noted that "in some jurisdictions, governments have

required Visa and MasterCard to reduce interchange fees, or have opened investigations as to whether Visa's or MasterCard's interchange fees and practices violate antitrust law." The 2016 10-K explicitly noted the that "the Federal Reserve Board issued a final rule capping debit card interchange fees at significantly lower rates than Visa or MasterCard previously charged." In this same section, the 2016 10-K stated that "[w]e and our payment card processors have implemented specific business processes for merchants to comply with payment card network operating rules for providing services to merchants."

### *February 7, 2018 Form 10-K*

136.   On February 7, 2018, the Company filed its annual report with the SEC on Form 10-K for the 2017 Fiscal Year (the "2017 10-K"). The 2017 10-K was signed by Defendants Schulman, Rainey, Anderson, Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern, Moffett, Sarnoff, and Yeary, and contained SOX certifications signed by Defendants Schulman and Rainey attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

137.   The 2017 10-K disclosed net revenues of $13.094 billion for the 2017 Fiscal Year, which included $11.402 billion in transaction revenues and $1.692 billion in revenues from other value added services.

138.   The 2017 10-K stated the following regarding the Company's disclosure controls and procedures:

> *Evaluation of disclosure controls and procedures.* Based on the evaluation of our disclosure controls and procedures (as defined in the Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act), our principal executive officer and our principal financial officer have concluded that as of December 31, 2017, the end of the period covered by this report, ***our disclosure controls and procedures were effective.***

(Emphasis added.)

139.   The 2017 10-K also included the following statement touting the Company's

implementation of "compliant solutions" for the regulatory environment in which the Company operates:

> We operate globally and in a rapidly evolving regulatory environment characterized by a heightened regulatory focus on all aspects of the payments industry. That focus continues to become even more heightened as regulators on a global basis focus on such important issues as . . . and ***consumer protection***. Some of the laws and regulations to which we are subject were enacted recently, and the laws and regulations applicable to us, including those enacted prior to the advent of digital and mobile payments, are continuing to evolve through legislative and regulatory action and judicial interpretation. Non-compliance with laws and regulations, increased penalties and enforcement actions related to non-compliance, changes in laws and regulations, or their interpretation, and the enactment of new laws and regulations applicable to us could have a material adverse impact on our business, results of operations and financial condition. Therefore, we monitor these areas closely to design ***compliant solutions for our customers who depend on us.***

(Emphasis added.)

140.    The 2017 10-K disclosed that the Company had entered into the 2015 Consent Order with the CFPB. With respect to the Company's efforts at implementing the changes to PayPal Credit disclosures and related business practices required by the Consent Order, the 2017 10-K stated: "***We continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order***, which may result in us incurring additional costs." (Emphasis added.)

### *February 7, 2019 Form 10-K*

141.    On February 7, 2019, the Company filed its annual report with the SEC on Form 10-K for the 2018 Fiscal Year (the "2018 10-K"). The 2018 10-K was signed by Defendants Schulman, Rainey, Anderson, Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, and Yeary, and contained SOX certifications signed by Defendants Schulman and Rainey attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company,

its officers, or its directors.

142.   The 2018 10-K disclosed net revenues of $15.451 billion for the 2018 Fiscal Year, which included $13.709 billion in transaction revenues and $1.742 billion in revenues from other value added services.

143.   The 2018 10-K stated the following regarding the Company's disclosure controls and procedures:

> *Evaluation of disclosure controls and procedures.* Based on the evaluation of our disclosure controls and procedures (as defined in the Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act), our principal executive officer and our principal financial officer have concluded that as of December 31, 2016, the end of the period covered by this report, ***our disclosure controls and procedures were effective.***

(Emphasis added.)

144.   The 2018 10-K also included the following statement touting the Company's implementation of "compliant solutions" for the regulatory environment in which the Company operates:

> We operate globally and in a rapidly evolving regulatory environment characterized by a heightened regulatory focus on all aspects of the payments industry. That focus continues to become even more heightened as regulators on a global basis focus on such important issues as countering terrorist financing, anti-money laundering, privacy, cybersecurity, and consumer protection. Some of the laws and regulations to which we are subject were enacted recently, and the laws and regulations applicable to us, including those enacted prior to the advent of digital and mobile payments, are continuing to evolve through legislative and regulatory action and judicial interpretation. New or changing laws and regulations, including how such laws and regulations are interpreted and implemented, as well as increased penalties and enforcement actions related to non-compliance, could have a material adverse impact on our business, results of operations, and financial condition. Therefore, ***we monitor these areas closely to design compliant solutions for our customers who depend on us.***

(Emphasis added.)

145.   The 2018 10-K disclosed that the Company had entered into the 2015 Consent

Order with the CFPB. With respect to the Company's efforts at implementing the changes to PayPal Credit disclosures and related business practices required by the Consent Order, the 2018 10-K stated: "***We continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order***, which may result in us incurring additional costs." (Emphasis added.)

### *April 10, 2019 Proxy Statement*

146.   On April 10, 2019, the Company the 2019 Proxy Statement. Defendants Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

147.   With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated the following, in relevant part:

> We expect our directors, officers, and employees to conduct themselves with the highest degree of integrity, ethics, and honesty. Our credibility and reputation depend upon the good judgment, ethical standards, and personal integrity of each director, officer, and employee. PayPal's Code of Business Conduct requires that our directors, executive officers, and other employees disclose actual or potential conflicts of interest and recuse themselves from related decisions. We regularly review the Code of Business Conduct and related policies to ensure that they provide clear guidance to our directors, executive officers, and employees. . . . Concerns about accounting or auditing matters or possible violations of our Code of Business Conduct should be reported under the procedures outlined in the Code of Business Conduct.

148.   The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

numerous false and misleading statements alleged herein, the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the Individual Defendants' failures to report violations of the Code of Conduct.

149.    The 2019 Proxy Statement also called for, among other things: (1) the election of twelve directors; (2) shareholder approval, on an advisory basis, of the Company's executive compensation; and (3) the ratification of the Company's independent auditors.

150.    The 2019 Proxy Statement was also false and misleading with regard to executive compensation. Specifically, the 2019 Proxy Statement asserted that executive compensation was determined according to a "pay for performance" philosophy, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein, as well as the Company's engagement in the PayPal Credit Misconduct and the Debit Interchange Misconduct.

151.    The 2019 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the PayPal Credit Misconduct; (2) the Debit Interchange Misconduct; (3) the Company's revenues from its PayPal Credit and debit card services were artificially inflated due to the PayPal Credit Misconduct and the Debit Interchange Misconduct and were therefore unsustainable; (4) as a result of the foregoing, the Company was subject to an increased risk of regulatory investigations and enforcement actions; and (5) the Company failed to maintain internal controls.

152.    As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders reelected Defendants Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary to the Board, allowing them to continue breaching their fiduciary duties to PayPal, and approved on an advisory basis the compensation of Defendants Schulman and Rainey, allowing them to receive more unjust compensation.

*February 6, 2020 Form 10-K*

153.   On February 6, 2020, the Company filed its annual report with the SEC on Form 10-K for the 2019 Fiscal Year (the "2019 10-K"). The 2019 10-K was signed by Defendants Schulman, Rainey, Anderson, Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, and Yeary, and contained SOX certifications signed by Defendants Schulman and Rainey attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

154.   The 2019 10-K disclosed net revenues of $17.772 billion for the 2019 Fiscal Year, which included $16.099 billion in transaction revenues and $1.673 billion in revenues from other value added services.

155.   The 2019 10-K stated the following regarding the Company's disclosure controls and procedures:

> *Evaluation of disclosure controls and procedures.* Based on the evaluation of our disclosure controls and procedures (as defined in the Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act), our principal executive officer and our principal financial officer have concluded that as of December 31, 2019, the end of the period covered by this report, ***our disclosure controls and procedures were effective.***

(Emphasis added.)

156.   The 2019 10-K also included the following statement touting the Company's implementation of "compliant solutions" for the regulatory environment in which the Company operates:

> We operate globally and in a rapidly evolving regulatory environment characterized by a heightened regulatory focus on all aspects of the payments industry. That focus continues to become even more heightened as regulators on a global basis focus on important issues such as . . . ***consumer protection***. Some of the laws and regulations to which we are subject were enacted recently, and the laws and regulations applicable to us, including those enacted prior to the advent of digital and mobile payments, are continuing to

evolve through legislative and regulatory action and judicial interpretation. New or changing laws and regulations, including the way laws and regulations are interpreted and implemented, as well as increased penalties and enforcement actions related to non-compliance, could have a material adverse impact on our business, results of operations, and financial condition. Therefore, we *monitor these areas closely to design compliant solutions for our customers who depend on us.*

(Emphasis added.)

157.   The 2019 10-K disclosed that the Company had entered into the 2015 Consent Order with the CFPB. With respect to the Company's efforts at implementing the changes to PayPal Credit disclosures and related business practices required by the Consent Order, the 2019 10-K stated: "*We continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order*, which may result in us incurring additional costs." (Emphasis added.)

### April 8, 2020 Proxy Statement

158.   On April 8, 2020, the Company filed its Schedule 14A with the SEC on (the "2020 Proxy Statement"). Defendants Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

159.   With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated the following, in relevant part:

We expect our directors, officers, and employees to conduct themselves with the highest degree of integrity, ethics, and honesty. Our credibility and reputation depend upon the good judgment, ethical standards, and personal integrity of each director, officer, and employee. PayPal's Code of Business

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Conduct requires that our directors, executive officers, and all other employees disclose actual or potential conflicts of interest and recuse themselves from related decisions. Directors, executive officers and other employees are expected to avoid any activity that is or has the appearance of being a conflict of interest with the Company. This includes refraining from engaging in activities that compete with or are adverse to the Company, or that interfere with the proper performance of duties or responsibilities to the Company. In addition, our Code of Business Conduct restricts the use of confidential company information, company assets, or position at the Company for personal gain.

We regularly review the Code of Business Conduct and related policies to ensure that they provide clear guidance to our directors, executive officers, and employees. . . . Concerns about accounting or auditing matters or possible violations of our Code of Business Conduct should be reported under the procedures outlined in the Code of Business Conduct.

160.   The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the Individual Defendants' failures to report violations of the Code of Conduct.

161.   The 2020 Proxy Statement also called for, among other things: (1) the election of eleven directors[5]; (2) shareholder approval, on an advisory basis, of the Company's executive compensation; and (3) the ratification of the Company's independent auditors.

162.   The 2020 Proxy Statement was also false and misleading with regard to executive compensation. Specifically, the 2020 Proxy Statement asserted that executive compensation was determined according to a "pay for performance" philosophy, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein, as well as the Company's engagement in the PayPal Credit Misconduct and the Debit Interchange Misconduct.

163.   The 2020 Proxy Statement was materially false and misleading and failed to

---

[5] Defendant Casares did not stand for reelection at the annual meeting held on May 21, 2020.

Verified Shareholder Derivative Complaint

disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the PayPal Credit Misconduct; (2) the Debit Interchange Misconduct; (3) the Company's revenues from its PayPal Credit and debit card services were artificially inflated due to the PayPal Credit Misconduct and the Debit Interchange Misconduct and were therefore unsustainable; (4) as a result of the foregoing, the Company was subject to an increased risk of regulatory investigations and enforcement actions; and (5) the Company failed to maintain internal controls.

164.   As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders reelected Defendants Adkins, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary to the Board, allowing them to continue breaching their fiduciary duties to PayPal, and approved on an advisory basis the compensation of Defendants Schulman and Rainey, allowing them to receive more unjust compensation.

### February 5, 2021 Form 10-K

165.   On February 5, 2021, the Company filed its annual report with the SEC on Form 10-K for the 2020 Fiscal Year (the "2020 10-K"). The 2020 10-K was signed by Defendants Schulman, Rainey, Karbowski, Adkins, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, and Yeary, and contained SOX certifications signed by Defendants Schulman and Rainey attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

166.   The 2020 10-K disclosed net revenues of $21.454 billion for the 2020 Fiscal Year, which included $19.918 billion in transaction revenues and $1.536 billion in revenues from other value added services.

167.   The 2020 10-K stated the following regarding the Company's disclosure

controls and procedures:

> *Evaluation of disclosure controls and procedures.* Based on the evaluation of our disclosure controls and procedures (as defined in the Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act), our principal executive officer and our principal financial officer have concluded that as of December 31, 2020, the end of the period covered by this report, ***our disclosure controls and procedures were effective***.

(Emphasis added.)

168.   The 2020 10-K also included the following statement touting the Company's implementation of "compliant solutions" for the regulatory environment in which the Company operates:

> We operate globally and in a rapidly evolving regulatory environment characterized by a heightened focus by regulators globally on all aspects of the payments industry, including . . . ***consumer protection***. The laws and regulations applicable to us, including those enacted prior to the advent of digital and mobile payments, are continuing to evolve through legislative and regulatory action and judicial interpretation. New or changing laws and regulations, including the changes to their interpretation and implementation, as well as increased penalties and enforcement actions related to non-compliance, could have a material adverse impact on our business, results of operations, and financial condition. ***We monitor these areas closely and are focused on designing compliant solutions for our customers.***

> Government regulation impacts key aspects of our business. ***We are subject to regulations that affect the payments industry in the markets we operate.***

(Emphasis added.)

***April 13, 2021 Proxy Statement***

169.   On April 13, 2021, the Company filed its Schedule 14A with the SEC on (the "2021 Proxy Statement"). Defendants Adkins, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material

misstatements and omissions.[6]

170.   With respect to the Company's Code of Conduct, the 2021 Proxy Statement stated the following, in relevant part:

> Our credibility and reputation depend upon the good judgment, ethical standards and personal integrity of each director, officer and employee. PayPal's Code of Business Conduct and Ethics ("Code of Conduct") requires that our directors, executive officers and all other employees disclose actual or potential conflicts of interest and recuse themselves from related decisions. Directors, executive officers and other employees are expected to avoid any activity that is or has the appearance of being a conflict of interest with the Company. This includes refraining from engaging in activities that compete with or are adverse to the Company, or that interfere with the proper performance of duties or responsibilities to the Company. In addition, our Code of Conduct restricts the use of confidential company information, company assets, or position at the Company for personal gain.
>
> We regularly review the Code of Conduct and related policies to ensure that they provide clear guidance. Concerns about accounting or auditing matters or possible violations of our Code of Conduct should be reported under the procedures outlined in the Code of Conduct.

171.   The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the Individual Defendants' failures to report violations of the Code of Conduct.

172.   The 2021 Proxy Statement also called for, among other things: (1) the election of eleven directors; (2) shareholder approval, on an advisory basis, of the Company's

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

executive compensation; and (3) the ratification of the Company's independent auditors.

173.    The Individual Defendants also caused the 2021 Proxy Statement to be false and misleading with regard to executive compensation. Specifically, the 2020 Proxy Statement asserted that executive compensation was determined according to a "pay for performance" philosophy, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein, as well as the Company's engagement in the PayPal Credit Misconduct and the Debit Interchange Misconduct.

174.    The 2021 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the PayPal Credit Misconduct; (2) the Debit Interchange Misconduct; (3) the Company's revenues from its PayPal Credit and debit card services were artificially inflated due to the PayPal Credit Misconduct and the Debit Interchange Misconduct and were therefore unsustainable; (4) as a result of the foregoing, the Company was subject to an increased risk of regulatory investigations and enforcement actions; and (5) the Company failed to maintain internal controls.

175.    As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders reelected Defendants Adkins, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary to the Board, allowing them to continue breaching their fiduciary duties to PayPal, and approved on an advisory basis the compensation of Defendants Schulman and Rainey, allowing them to receive more unjust compensation.

176.    The statements made on Forms 10-K that are referenced in ¶¶131–35, 137–40, 142–45, 154–57, and 166–68 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the PayPal Credit

Misconduct; (2) the Debit Interchange Misconduct; (3) the Company's revenues from its PayPal Credit and debit card services were artificially inflated due to the PayPal Credit Misconduct and the Debit Interchange Misconduct and were therefore unsustainable; (4) as a result of the foregoing, the Company was subject to an increased risk of regulatory investigations and enforcement actions; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

177.   The truth regarding the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the false and misleading statements described herein emerged on July 29, 2021, when the Company filed the 2021Q2 10-Q with the SEC. In the 2021Q2 10-Q, the Company made the following disclosure, which revealed that the Company's practices related to the PayPal Credit and debit card services had led to investigations by regulatory authorities:

> We have received a CID from the CFPB related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services. The CID requests the production of documents, written reports, and answers to written questions. We are cooperating with the CFPB in connection with this CID.

> We have responded to subpoenas and requests for information received from the [SEC] Enforcement Division ("SEC") relating to whether the interchange rates paid to the bank that issues debit cards bearing our licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System, and to the reporting of marketing fees earned from the Company's branded card program. We are cooperating with the SEC in connection with this investigation.

178.   On this news, the Company's stock price fell by $18.81 per share from its closing price of $301.98 on July 28, 2021, to close at $283.17 on July 29, 2021, a decline of approximately 6.23%.

### DAMAGES TO PAYPAL

179.   As a direct and proximate result of the Individual Defendants' conduct, PayPal will lose and expend many millions of dollars.

180.   Such expenditures include, but are not limited to, the costs, legal fees, arbitration fees, and/or other fees associated with the CFPB investigation, the SEC investigation, and the Securities Class Action filed against the Company, its CEO and its CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

181.   Such expenditures include, but are not limited to, costs associated with defending against claims brought by individuals or institutions as a result of the Company's engagement in the PayPal Credit Misconduct and/or Debit Interchange Misconduct.

182.   Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

183.   As a direct and proximate result of the Individual Defendants' conduct, PayPal has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

184.   Plaintiff brings this action derivatively and for the benefit of PayPal to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of PayPal, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

185.   PayPal is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

186.   Plaintiff is, and has been at all relevant times, a shareholder of PayPal.

Plaintiff will adequately and fairly represent the interests of PayPal in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

187.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

188.   A pre-suit demand on the Board of PayPal is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following twelve individuals: Defendants Schulman, Adkins, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Yeary (the "Director-Defendants"), and non-party Enrique Lores (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors that were on the Board at the time of the filing of this complaint.

189.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, while three of them engaged in insider sales based on material non-public information, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

190.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, three of the Director-Defendants sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Director-Defendants breached their fiduciary

duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

191.    Demand is also excused as to the Director-Defendants because they were fully aware of the PayPal Credit Misconduct during the Relevant Period, as evidenced by, among other things, the SBPC Letter, dated August 20, 2020, which was addressed to Director-Defendant Schulman. The Director-Defendants' knowledge of compliance issues related to the PayPal Credit Misconduct is further apparent due to statements made by the spokesperson for the Company. Specifically, on August 27, 2020, Company spokesperson Joe Gallo was quoted responding to the SBPC Letter and SBPC Report in a Yahoo.com news article.[7] Nonetheless, the Director-Defendants caused or permitted the Company to engage in the PayPal Credit Misconduct, or failed to engage in oversight or implement effective internal controls to ensure the Company's compliance with the applicable laws and regulations. As a result, the Company engaged in the PayPal Credit Misconduct, prompting an investigation by the CFPB. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

192.    Furthermore, Director-Defendants Schulman, Donahoe, Dorman, Johnson, McGovern, Moffett, and Yeary signed the 2016 10-K, which contained a statement expressly acknowledging the Federal Reserve Board's rule capping debit card interchange fees. Nonetheless, these seven Director-Defendants caused the Company to engage in the Debit Interchange Misconduct. Nonetheless, they failed to engage in oversight or implement effective internal controls to ensure the Company's compliance with the applicable laws and regulations. Thus, these seven Director-Defendants face a substantial likelihood of liability with respect to the Debit Interchange Misconduct, and demand is futile as to them.

193.    Additional reasons that demand on Defendant Schulman is futile follow.

---

[7]    https://www.yahoo.com/now/pay-pal-credit-for-profit-schools-213858404.html    (last accessed 10/22/2021).

Defendant Schulman has served as President, CEO, and director of PayPal since July 2015. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Schulman with his principal occupation, for which he receives handsome compensation, including over $23 million in the 2020 Fiscal Year, over $37 million in the 2019 Fiscal Year, nearly $38 million in the 2018 Fiscal Year, and over $19 million in the 2017 Fiscal Year. Defendant Schulman was ultimately responsible for many of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein. Moreover, the 2019, 2020, and 2021 Proxy Statements (the "Proxy Statements") were solicited on his behalf, which contained false and misleading statements. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the PayPal Credit Misconduct, despite being the named addressee of the SBPC Letter. Similarly, he conducted little, if any, oversight of the Debit Interchange Misconduct and the scheme to cause the Company to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and he consciously disregarded his duties to protect corporate assets. His insider sale, which yielded over $3 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Moreover, Defendant Schulman is a defendant in the Securities Class Action. For these reasons, Defendant Schulman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194.   Additional reasons that demand on Defendant Adkins is futile follow. Defendant Adkins has served as a Company director and as a member of the ARC Committee since September 2017. Defendant Adkins has received and continues to receive compensation for his role as a director as described above. In addition, the Proxy Statements were solicited on his behalf, which contained false and misleading statements. Furthermore, Defendant Adkins signed, and thus personally made the false and misleading

statements in the 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Adkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.   Additional reasons that demand on Defendant Christodoro is futile follow. Defendant Christodoro has served as a Company director since July 2015. In addition, he served as a member of the Compensation Committee throughout the Relevant Period and as a member of the Governance Committee during a portion of the Relevant Period. Defendant Christodoro has received and continues to receive compensation for his role as a director as described above. In addition, the Proxy Statements were solicited on his behalf, which contained false and misleading statements. Furthermore, Defendant Christodoro signed, and thus personally made the false and misleading statements in the 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Christodoro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.   Additional reasons that demand on Defendant Donahoe is futile follow. Defendant Donahoe has served as a Company director since July 2015. In addition, he served as Chair of the Board throughout the Relevant Period. Defendant Donahoe has

received and continues to receive compensation for his role as a director as described above. In addition, the Proxy Statements were solicited on his behalf, which contained false and misleading statements. Furthermore, Defendant Donahoe signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Donahoe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.   Additional reasons that demand on Defendant Dorman is futile follow. Defendant Dorman has served as a Company director since June 2015. He served as Chair of the Compensation Committee and as a member of the Governance Committee throughout the Relevant Period. Defendant Dorman has received and continues to receive compensation for his role as a director as described above. In addition, the Proxy Statements were solicited on his behalf, which contained false and misleading statements. Furthermore, Defendant Dorman signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Dorman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.   Additional reasons that demand on Defendant Johnson is futile follow.

Defendant Johnson has served as a Company director and as a member of the ARC Committee since January 2017. Defendant Johnson has received and continues to receive compensation for her role as a director as described above. In addition, the Proxy Statements were solicited on her behalf, which contained false and misleading statements. Furthermore, Defendant Johnson signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant McGovern is futile follow. Defendant McGovern has served as a Company director since June 2015. In addition, she served as Chair of the Governance Committee throughout the Relevant Period and as a member of the ARC Committee during a portion of the Relevant Period. Defendant McGovern has received and continues to receive compensation for her role as a director as described above. In addition, the Proxy Statements were solicited on her behalf, which contained false and misleading statements. Furthermore, Defendant McGovern signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant McGovern breached her fiduciary duties, faces a substantial likelihood of liability, is not independent

or disinterested, and thus demand upon her is futile and, therefore, excused.

200.   Additional reasons that demand on Defendant Messemer is futile follow. Defendant Messemer has served as a Company director and a member of the ARC Committee since January 2019. Defendant Messemer has received and continues to receive compensation for her role as a director as described above. In addition, the Proxy Statements were solicited on her behalf, which contained false and misleading statements. Furthermore, Defendant Messemer signed, and thus personally made the false and misleading statements in the 2018, 2019, and 2020 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Messemer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.   Additional reasons that demand on Defendant Moffett is futile follow. Defendant Moffett has served as a Company director since June 2015. In addition, he served as Chair of the ARC Committee throughout the Relevant Period. Defendant Moffett has received and continues to receive compensation for his role as a director as described above. In addition, the Proxy Statements were solicited on his behalf, which contained false and misleading statements. Furthermore, Defendant Moffett signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Moffett

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on Defendant Sarnoff is futile follow. Defendant Sarnoff has served as a Company director and a member of the ARC Committee since June 2017. Defendant Sarnoff has received and continues to receive compensation for her role as a director as described above. Her insider sale, which yielded over $1.6 million in proceeds, demonstrates her motive in facilitating and participating in the fraud. In addition, the Proxy Statements were solicited on her behalf, which contained false and misleading statements. Furthermore, Defendant Sarnoff signed, and thus personally made the false and misleading statements in the 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Sarnoff breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Yeary is futile follow. Defendant Yeary has served as a Company director since July 2015, and he served as a member of the ARC Committee throughout the Relevant Period. Defendant Yeary has received and continues to receive compensation for his role as a director as described above. In addition, the Proxy Statements were solicited on his behalf, which contained false and misleading statements. Furthermore, Defendant Yeary signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, 2019, and 2020 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor

internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Yeary breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204. Additional reasons that demand on the Board is futile follow.

205. As described above, three of the Director-Defendants directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Schulman, Rainey, and Sarnoff received proceeds of approximately $6.25 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case as to these three Director-Defendants is futile, and therefore excused.

206. The Director-Defendants have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Moffett and Donahoe served together on the board of directors of eBay Inc., the former parent company of PayPal, from 2008 until July 2015. Moreover, Director-Defendants Christodoro, Donahoe, Dorman, McGovern, Moffett, Schulman, and Yeary have all served as Company directors since 2015. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

207. Defendants Adkins, Johnson, McGovern, Messemer, Moffett, Sarnoff, and Yeary (the "ARC Defendants") served as members of the ARC during the Relevant Period. Pursuant to the ARC Charter, the ARC Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's

financial reporting process, and the Company's internal controls over financial reporting. The ARC Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the ARC Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Moreover, the CFPB's investigation into the PayPal Credit Misconduct and the SEC's investigation into the Debit Interchange Misconduct evidences that the ARC Defendants failed to fulfill their responsibilities to ensure legal and regulatory compliance, as well as internal auditing functions. Thus, the ARC Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

208.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the PayPal Credit Misconduct and the Debit Interchange Misconduct and the implementation of policies that could have prevented the misconduct. The Director-Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

209.   PayPal has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for PayPal any part of the damages PayPal suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

210.   The Individual Defendants' conduct described herein and summarized above

could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

211.  The acts complained of herein constitute violations of fiduciary duties owed by PayPal's officers and directors, and these acts are incapable of ratification.

212.  The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of PayPal. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of PayPal, there would be no directors' and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

213.  If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause PayPal to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is

futile in that event, as well.

214.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Schulman, Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, and Yeary for Violations of Section 14(a) of the Exchange Act**

215.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

217.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

218.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of

the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

219.   Under the direction and watch of Defendants Schulman, Adkins, Casares,[8] Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, and Yeary (the "Proxy Statement Defendants") the Proxy Statements failed to disclose, *inter alia*: (1) the PayPal Credit Misconduct; (2) the Debit Interchange Misconduct; (3) the Company's revenues from its PayPal Credit and debit card services were attributable at least in part to the PayPal Credit Misconduct and the Debit Interchange Misconduct and were therefore unsustainable; (4) as a result of the foregoing, the Company was subject to an increased risk of regulatory investigations and enforcement actions; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

220.   The Proxy Statement Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

221.   Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in or tolerance of the PayPal Credit Misconduct, the Debit Interchange Misconduct, and the scheme to cause the Company to issue false and

---

[8] Defendant Casares was no longer a member of the Board when the Board solicited the 2021 Proxy Statement, and thus Plaintiff specifically excludes Defendant Casares from Plaintiff's claim under Section 14(a) of the Exchange Act with respect to the 2021 Proxy Statement.

misleading statements and/or omissions of material fact.

222.   In the exercise of reasonable care, the Proxy Statement Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, advisory approval of executive compensation, and ratification of the Company's independent auditor.

223.   The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary, which allowed them to continue breaching their fiduciary duties to PayPal. Furthermore, the false and misleading elements of the 2019 Proxy Statement led shareholders to approve, on an advisory basis, the compensation of Defendants Schulman and Rainey.

224.   The false and misleading elements of the 2020 Proxy Statement led to the re-election of Defendants Adkins, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary, which allowed them to continue breaching their fiduciary duties to PayPal. Furthermore, the false and misleading elements of the 2020 Proxy Statement led shareholders to approve, on an advisory basis, the compensation of Defendants Schulman and Rainey.

225.   The false and misleading elements of the 2021 Proxy Statement led to the re-election of Defendants Adkins, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary, which allowed them to continue breaching their fiduciary duties to PayPal. Furthermore, the false and misleading elements of the 2021 Proxy Statement led shareholders to approve, on an advisory basis, the compensation of Defendants Schulman and Rainey.

226.   The Company was damaged as a result of the Proxy Statement Defendants'

material misrepresentations and omissions in the Proxy Statements.

227.   Plaintiff on behalf of PayPal has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

228.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

229.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of PayPal's business and affairs.

230.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

231.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of PayPal.

232.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

233.   In further breach of their fiduciary duties, the Individual Defendants either caused or permitted the Company to engage in the PayPal Credit Misconduct and the Debit Interchange Misconduct.

234.   In breach of their fiduciary duties owed to PayPal, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) the PayPal Credit Misconduct; (2) the Debit Interchange Misconduct; (3) the Company's revenues from its PayPal Credit and debit card services were attributable at least in part to the PayPal Credit Misconduct and the Debit Interchange Misconduct and were therefore unsustainable; (4)

as a result of the foregoing, the Company was subject to an increased risk of regulatory investigations and enforcement actions; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

235. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

236. In breach of their fiduciary duties, three of the Individual Defendants made lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

237. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PayPal's securities and disguising insider sales.

238. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PayPal's securities and disguising insider sales.

239.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

240.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PayPal has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

241.   Plaintiff on behalf of PayPal has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

242.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

243.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, PayPal.

244.   The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from PayPal that was tied to the performance or artificially inflated valuation of PayPal, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

245.   Plaintiff, as a shareholder and a representative of PayPal, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

246.   Plaintiff on behalf of PayPal has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

247.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

248.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence PayPal, for which they are legally responsible.

249.   As a direct and proximate result of the Individual Defendants' abuse of control, PayPal has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, PayPal has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

250.   Plaintiff on behalf of PayPal has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

251.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

252.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of PayPal in a manner consistent with the operations of a publicly-held corporation.

253.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, PayPal has sustained and will continue to sustain significant damages.

254.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

255.   Plaintiff on behalf of PayPal has no adequate remedy at law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

256.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

257.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

258.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

259.   Plaintiff on behalf of PayPal has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Schulman and Rainey for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

260.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

261.   Nominal Defendant PayPal and Defendants Schulman and Rainey are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schulman and Rainey willful and/or reckless violations of their obligations as officers and/or directors of PayPal.

262.   Defendants Schulman and Rainey, because of their positions of control and authority as officers and/or directors of PayPal, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of PayPal, including the wrongful acts complained of herein and in the Securities Class Action.

263.   Accordingly, Defendants Schulman and Rainey are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

264.   As such, PayPal is entitled to receive all appropriate contribution or indemnification from Defendants Schulman and Rainey.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of PayPal, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to PayPal;

(c)   Determining and awarding to PayPal the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing PayPal and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect PayPal and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of PayPal to nominate at least six

candidates for election to the board; and

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding PayPal restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 16, 2021      Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I,      Shang Pang      am      a      plaintiff      in      the within      action. I have   reviewed   the   allegations   made   in   this   shareholder   derivative complaint, know   the   contents   thereof,   and   authorize   its   filing.   To   those allegations   of which   I have   personal   knowledge,   I   believe   those   allegations   to be   true.   As to   those   allegations   of which   I   do   not   have   personal knowledge, I rely  upon  my counsel and their investigation and believe them to be true.

     I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2021.

12/16/2021

DocuSigned by:

_Shangfiao_

39ED339B43D84FD...

Shang Pang